AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT

2/17/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT

02/17/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: ___GR___ DEPUTY

| | |
|---|---|
| United States of America | |
| Plaintiff(s) | |
| v. | Case No.   2:23-mj-00782-DUTY |
| DENEYVOUS HOBSON ("HOBSON") and JAMES RUSSELL DAVIS ("DAVIS") | |
| Defendant(s). | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.  On or about the date of February 14, 2022,  in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1951(a) | Conspiracy to Interfere with Commerce by Robbery |

This criminal complaint is based on these facts:

*Please see attached affidavit.*
☒ Continued on the attached sheet.

*Special Agent Elizabeth Langan Cardenas*
_____
Complainant's signature

Elizabeth Cardenas, FBI Special Agent
_____
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   February 17, 2023

_____
Judge's signature

City and state:   Los Angeles, California

Honorable Karen L. Stevenson, U.S. Magistrate Judge
_____
Printed name and title

**AFFIDAVIT**

I, Elizabeth Langan Cardenas, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.      I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since January 2019.  As an FBI agent, I am authorized to investigate violations of United States law and execute warrants issued under the authority of the United States.  I am currently assigned to the Violent Crime squad at the FBI Long Beach Resident Agency.  My training includes a wide array of investigative techniques, operational skills, firearms, tactics, case management, cybersecurity, and interview and interrogation training.  My responsibilities include investigating violent street gangs, narcotics, extortion, cyberstalking, armed bank robberies, armed commercial robberies, and crimes against children in the Central District of California.  I have also received specialized training and instruction related to these matters.  I have participated in numerous federal and state investigations, and through my participation in these investigations, I have interviewed numerous witnesses, cooperating sources, and defendants.  During my time with the FBI, I have executed numerous search warrants and participated in the seizure of physical and digital evidence.

2.      Through the bank robbery and commercial/retail robbery investigations in which I have participated, I have used a variety of investigative techniques, including witness

interviews, speaking with law enforcement agents and officers, reviewing surveillance images and cellular telephone data, and reviewing physical evidence.  As a result of this experience and my conversations with other law enforcement personnel, to include FBI Special Agents and local law enforcement detectives with experienced in commercial robbery investigations, I am familiar with the methods used by individuals to commit robberies as well as effective investigative methods to solve them.

## II.  <u>PURPOSE OF AFFIDAVIT</u>

3.    This affidavit is made in support of a criminal complaint against DENEYVOUS HOBSON ("HOBSON") and JAMES RUSSELL DAVIS ("DAVIS") for a violation of Title 18, United States Code, Section 1951(a) (Conspiracy to Interfere with Commerce by Robbery).

4.    This affidavit is also made in support of an application for a warrant to search the following:

a.    The person of HOBSON, as described more fully in Attachment A-1; and

b.    The person of DAVIS, as described more fully in Attachment A-2.

5.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 371, Conspiracy to Commit Bank Robbery; 18 U.S.C. § 2113(a), Bank Robbery; 18 U.S.C. § 1951(a) (Conspiracy to Commit and Interference with Commerce by Robbery), and 18 U.S.C. § 924(c), Use of a Firearm in Furtherance of a Crime of Violence, as described more fully in Attachment B (the "Subject Offenses").

6.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    On January 24, 2022, at approximately 8:48 a.m., HOBSON and DAVIS were seen in a white Chevrolet Tahoe bearing California License Plate 7ABW490 and Vehicle Identification Number 1GNFC13068J182738 (the "WCU Casing Vehicle"), registered to and operated by DAVIS, circling the Wescom Credit Union branch at 2871 W. 120th Street, Hawthorne, California ("WCU") for approximately one hour while a future victim, J.G -- a Sectran Security, Inc., armored car driver -- parked his armored car and collected cash from WCU's ATMs.  DAVIS and HOBSON also parked the WCU Casing Vehicle facing the ATMs while J.G. collected cash.  After a WCU employee called police to report that the WCU Casing Vehicle and its occupants were engaged in suspicious activity, law enforcement pulled DAVIS and HOBSON over in the WCU Casing Vehicle.  The two men provided their identification and both had 2943 Chesapeake Avenue, Los Angeles, California (the "Chesapeake Ave. Address") listed as their primary residence.

8.   Three weeks later, to the day -- and almost the exact same minute -- on February 14, 2022, at approximately 8:48 a.m., J.G. was robbed while collecting cash from the same WCU ATMs. The suspects were three black males who used what appeared to be an AR-15 and a handgun.  During the robbery, they stole J.G.'s service pistol, as well as approximately $100,000.  Surveillance video from WCU robbery shows that one of the armed suspects had a distinctive star tattoo on his lower back that is of the same shape, color, and location as a distinctive star tattoo on HOBSON's lower back.

9.   On June 9, 2022, at approximately 7:50 a.m., a Loomis armored car employee was robbed at a Bank of America branch at 11525 Crenshaw Boulevard, Inglewood, California (the "Inglewood BoA")-- just 0.6 miles from the WCU robbery -- by three suspects who used the same modus operandi as the WCU robbery a few months earlier.  The suspects took the armored car driver's handgun and approximately $92,840.  A vehicle matching DAVIS's WCU Casing Vehicle was seen leading a getaway car within 30 minutes of the robbery on a nearby Ring camera.  Security footage from the night before the Inglewood BoA robbery shows the getaway vehicle outside the Chesapeake Ave. Address, and an unidentified male is seen wearing the same shoes as the Inglewood BoA robbery.

10.  On September 15, 2022, at approximately 12:20 p.m., a Brinks armored car driver was robbed at PLS Check Cashers at 2601 S. La Brea, Avenue, Los Angeles, California ("PLS"), in a similar manner, again by three suspects matching HOBSON and DAVIS's description, and departing with approximately $375,000

and the armored car driver's handgun.  What appears to be
DAVIS's WCU Casing Vehicle was again seen leading a getaway car
within 30 minutes of the robbery on a nearby Ring camera.
Security footage from just before the PLS robbery shows the
getaway vehicle outside the Chesapeake Ave. Address and an
unidentified male is seen wearing the same shoes as the PLS
robbery and holding zip ties similar to those used in the
robbery.  Security footage from the night before the PLS robbery
shows the getaway vehicle, as well as HOBSON and DAVIS, and the
WCU Casing Vehicle at HOBSON and DAVIS's residence.

    11.  On January 9, 2023, at approximately 7:15 a.m., a
Brinks armored car employee was robbed at 99 Cents Only Store at
3060 South Crenshaw Boulevard, Los Angeles, California (the "99C
Store") -- just 1.5 miles from the BoA and PLS robberies -- by
three suspects who used the same modus operandi as the other
robberies.  Security footage from before the September 14, 2022
PLS robbery showed the 99C getaway vehicle along with the WCU
casing vehicle at HOBSON and DAVIS's residence.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.   <u>February 14, 2022 Robbery of Sectran Armored Vehicle at WCU</u>

    15.  On February 14, 2022, at approximately 8:48 a.m., law
enforcement responded to a robbery call from WCU.  Police
dispatch advised that the victim, J.G., an armored car driver
with Sectran Security, was working with the outside WCU ATM when
three male subjects robbed him at gunpoint.  Responding law

enforcement confirmed that robbers stole approximately $100,000 in and J.G.'s service pistol.

16.  Responding officers reviewed WCU's video surveillance recordings and observed that at 8:48 a.m., J.G., was kneeling down working at the west outdoor WCU drive-thru ATM.  While J.G. was working, a white Honda Accord with what appeared to be California plates (the "WCU Getaway Vehicle") parked at the east outdoor WCU drive-thru ATM, next to J.G.  The WCU Getaway Vehicle appeared to be occupied by four individuals -- the driver and three passengers.  The three passengers exited the WCU Getaway Vehicle and moved directly toward J.G. as the driver remained inside the car.  One of the subjects was armed with what appeared to be a black AR-style rifle with an attached optic.  A second subject appeared to be armed with a black semi-automatic handgun.  The subjects approached J.G., ordered and physically forced him to the ground, and removed J.G.'s service weapon from J.G.'s holster.  The subjects then took the cash and customer checks from the WCU ATM, which J.G. was going to either deposit into the ATM or retrieve to provide to WCU.

17.  As the subjects made their way back to the WCU Getaway Vehicle, one of the subjects, who appeared to be armed with a semi-automatic handgun, discharged his handgun, or J.G.'s service weapon, leaving a bullet casing behind in the area of the robbery.  The subjects then fled with approximately $100,000 in cash, a bag of check deposits from the WCU ATM, and J.G.'s service pistol.  The subjects entered the WCU Getaway Vehicle,

and departed the area traveling eastbound on 120th Street, then traveling northbound on Van Ness Avenue and out of sight.

18. I have reviewed surveillance video recordings of the robbery and I learned the following:

a. The robbery as seen in the video matches the description of the robbery by law enforcement.

b. The first subject ("SUBJECT 1") is an adult Black male, heavy set, wearing a dark ski mask with an integrated bill/visor, a reflective yellow security shirt, and unknown color pants. SUBJECT 1 carried a black AR-style rifle with a mounted optic.

c. The second subject ("SUBJECT 2") is an adult black male, wearing a hooded dark sweatshirt with the hood up, dark baseball cap, and dark pants. SUBJECT 2 carried what appeared to be white zip ties in his front sweatshirt pocket.

d. The third subject ("SUBJECT 3") is an adult black male, wearing a dark hooded sweatshirt with the hood up, dark ski mask with an integrated bill/visor, and dark pants with a consistent build and physical description as HOBSON. SUBJECT 3 had a star-shaped tattoo on his lower back that can be seen when his shirt lifted up during the robbery -- the precise tattoo in the same location as HOBSON's, described below. SUBJECT 3 carried a black semi-automatic handgun.



**B.    Occupants of the WCU Casing Vehicle Case WCU Exactly Three Weeks Before the WCU Robbery**

19.    WCU has since provided to investigators, and I have reviewed, a bank security report dated January 24, 2022, detailing a suspicious incident.  The report described that on January 24, 2022, at approximately 8:40 a.m., the WCU Casing Vehicle, was observed in the WCU ATM drive-thru lane next to the Sectran Security Armored Vehicle that was also present at WCU. The occupants of the WCU Casing Vehicle appeared to be taking photographs of the armored vehicle and its driver.  Sectran determined that the armored vehicle truck and driver (J.G.) were the same on January 24, 2022 during the case and on February 14, 2022 during the robbery.

20.    Also on January 24, 2022, at approximately 9:00 a.m., a WCU employee called local law enforcement to report the suspicious incident involving the WCU Casing Vehicle and the suspicious incident at WCU.  The reporting party stated that the WCU Casing Vehicle was circling WCU and possibly casing in the area.  Hawthorne Police Department ("HPD") officers responded to the call and effected a traffic stop on the WCU Casing Vehicle near WCU.  The occupants of the WCU Casing Vehicle identified themselves to HPD officers as DAVIS and HOBSON.  DAVIS and

HOBSON both provided their California driver's licenses during their interaction with patrol officers and both driver's licenses listed the Chesapeake Ave. Address as their home address.



WCU Casing Vehicle at WCU on 1/24/22

### C.   Additional Investigation of WCU Robbers

21.   Following the robbery on February 14, 2022, law enforcement canvassed the area around WCU in order to locate surveillance video from nearby businesses or residences.   Law enforcement located a residential Ring camera on 119th Street and Haas Avenue, approximately .6 miles away from WCU.   The Ring camera footage showed an older model white Chevrolet Tahoe, with tinted windows, consistent in make, model, color, and year as the WCU Casing Vehicle, leading a newer model white Honda Accord

with tinted windows, resembling the WCU Getaway Vehicle, at approximately 8:34 a.m. -- 14 minutes before the robbery at WCU.

22.  Investigators then conducted records and database checks on the WCU Casing Vehicle, DAVIS, and HOBSON.  The database checks regarding the WCU Casing Vehicle returned results listing DAVIS as its registered owner at the address of the Chesapeake Ave. Address.

23.  The database checks regarding HOBSON returned results indicating HOBSON possessed and utilized telephone number 310-424-8082 ("Hobson Cell").

24.  The database checks regarding DAVIS returned results indicating DAVIS possessed and utilized telephone number 424-285-4176 ("Davis Cell").

25.  Law enforcement then obtained call detail records for Hobson Cell and Davis Cell.  Cell phone location data for Hobson Cell show that on January 24, 2022, the day HOBSON and DAVIS were seen circling WCU, Hobson Cell had cell phone activity at or around the Chesapeake Ave. Address a few hours after HOBSON was seen at WCU.

26.  Cell phone location data for Davis Cell show that on the same day, Davis Cell had cell phone activity at or around the Chesapeake Ave. Address early in the morning before being seen at WCU as well as several hours after.

27.  Historical call records for Hobson Cell also show that on February 14, 2022, the day of the WCU robbery, Hobson Cell made several phone calls at or around the Chesapeake Ave. Address during the afternoon following the robbery.  Cell phone

location data for Davis Cell also show that Davis Cell also had cell phone activity at or around the Chesapeake Ave. Address after the robbery.

28.  The cellular activity of both HOBSON and DAVIS at or around the Chesapeake Ave. Address, along with the Chesapeake Ave. Address being an address of record for both HOBSON and DAVIS, led law enforcement to believe that the Chesapeake Ave. Address may serve as a hideout or staging area for HOBSON and DAVIS and that evidence pertinent to the robbery series is likely to be found at the Chesapeake Ave. Address. The same cell phone location data suggests that HOBSON and DAVIS may have turned their phones off in order to avoid law enforcement detection during the robbery.  Specifically, cell phone location data for Hobson Cell shows no cellular activity for two hours during which the robbery occurred.  Cell phone location data for Davis Cell shows no cellular activity -- meaning the phones were not pinging off of any cellular network towers during that time -- on Davis Cell for approximately one hour and twenty minutes around the time the robbery occurred.

29.  On May 16, 2022, law enforcement obtained a cell tower warrant to obtain phone numbers that were pinging off cell towers near WCU right before, during, and right after the robbery.  I have reviewed those records and determined the following:

a.  Neither Hobson Cell or Davis Cell pinged off towers near WCU during the time of the robbery.  This

information coincides with the call data records for both DAVIS and HOBSON.

  b. I believe that HOBSON and DAVIS either turned off their cellular phones right before the robbery or left their cellular phones at home and did not bring them with them in an effort to not be detected by law enforcement, which is a common practice by criminals when they commit their crimes.

 30. On May 17, 2022, investigators issued a Grand Jury subpoena to Block, Inc. and received a response on May 31, 2022 with returns for both HOBSON's and DAVIS's CashApp accounts.

 31. Investigators received returns from Block, Inc. for DAVIS's CashApp account that included a bank of account of DAVIS's with Baxter Credit Union.

  **D.** **June 9, 2022 Robbery of Loomis Armored Vehicle at the Inglewood Bank of America**

 32. On June 9, 2022, at approximately 8:00 a.m., law enforcement responded to a robbery call outside the Inglewood BoA.  Information from police dispatch advised that the victim, S.C., an armed employee of Loomis Armored Services, was working on the outside the Inglewood BoA ATM when three male subjects robbed him at gunpoint.  Responding law enforcement confirmed that approximately $92,840 in cash was stolen, as well as S.C.'s service pistol.  The subjects were seen fleeing in a silver or gray Chevrolet Equinox four-door sports utility vehicle (the "BoA Getaway Vehicle").

33.   I have reviewed surveillance video recordings of the robbery and I learned the following:

a.   The robbery as seen in the video matches the description of the robbery by law enforcement and by victim.

b.   At approximately 7:50 a.m. on June 9, 2022, the driver of the Loomis armored vehicle, S.C., was kneeling working on the Inglewood BoA drive-thru ATM, and the armored vehicle was parked next to him.  While S.C. was working, the BoA Getaway Vehicle drove up and parked behind the armored vehicle.

c.   S.C. continued working on the ATM when he noticed someone ("SUBJECT 1") approach from the passenger side of the armored vehicle carrying a dark short-barreled assault rifle and pointed it at S.C.  The rifle appeared to be similar to the rifle used by the subjects during the February 14, 2022 WCU robbery, as well as the later robberies discussed below.

d.   SUBJECT 1 appeared to be an adult dark-skinned male, wearing a green hooded sweatshirt with the hood up, black pants, dark shoes, black gloves, red face covering, and a black outer carrier vest bearing the word "Security" in yellow color on the front and back of vest.  S.C. stated that SUBJECT 1 told him not to move at first, then had him put his hands behind his head.

e.   As S.C was complying, the second subject ("SUBJECT 2") approached from the driver side of the armored vehicle.  SUBJECT 2 appeared to be an adult dark-skinned male, wearing dark face covering, a dark hooded sweatshirt with the

hood up, dark pants, multi-color shoes of dark, white, and baby blue while holding a zip tie.

     f.    The third subject ("SUBJECT 3") approached right behind SUBJECT 2.  SUBJECT 3 appeared to be an adult dark-skinned male, consistent in appearance with HOBSON, wearing a dark and white face covering, half gray and black hooded sweatshirt with the hood up, gray pants, red and white shoes and holding a black bag.

     g.    While SUBJECT 2 placed S.C.'s hand in zip-tie handcuffs, SUBJECT 1 removed S.C.'s service pistol out of his holster.  SUBJECT 3 removed the keys from S.C.'s belt and opened the side door of the armored vehicle.  SUBJECT 2 told S.C. to get out of the way and pushed him to the side.

     h.    Shortly after, SUBJECT 1 grabbed the loose cash from the ATM and placed the cash into the ATM bag from Loomis. SUBJECT 1 then entered the armored vehicle and joined SUBJECT 3. SUBJECT 1 exited the truck carrying a black bag and SUBJECT 1 then told S.C. that he better tell him where the rest of the money was or he would knock his teeth out.  S.C said there was not any more money.  Per surveillance video, it appeared SUBJECT 1 did have a short conversation with S.C. before kicking him to the ground when all three subjects departed the Inglewood BoA in the BoA Getaway Vehicle.

34.  Loomis Corporate Security confirmed the loss amount from the robbery to be approximately $48,000 stolen from inside the armored vehicle, and approximately $44,840 stolen from the Inglewood BoA ATM, totaling approximately $92,840.

**E.    June 9, 2022 911 Call at 10935 South Spinning Avenue, Inglewood, CA**

35.   At approximately 8:03 a.m. on June 9, 2022, less than 10 minutes after the Loomis armored vehicle robbery occurred at the Inglewood BoA, a witness called 911 to report an incident at an intersection near 10935 South Spinning Avenue, Inglewood, California.  The witness told dispatch that they observed three males covered in black ski masks and black clothing, armed with a handgun and a black assault rifle, exchanging a backpack.  The witness also told dispatch that they observed the three males exit/enter two vehicles, a white truck and/or a white four-door vehicle, consistent with the WCU Casing Vehicle.

**F.    Additional Investigation of June 9, 2022 Robbery**

36.   Upon canvassing the area of the robbery and the area of the eyewitness incident, law enforcement located a residential Ring camera located near 10932 South Spinning Avenue, Inglewood, California, approximately 350 feet from where the eyewitness 911 call occurred.  I have reviewed the Ring camera video and determined:

a.    An older model white Chevrolet Tahoe with tinted windows drove south on Spinning Avenue, followed immediately by a silver Chevrolet Equinox at approximately 7:23 a.m., around 27 minutes before the robbery at the Inglewood BoA.

b.    The white Chevrolet Tahoe is consistent in make, model, year, and color to the WCU Casing Vehicle and the silver

Chevrolet Equinox is consistent in make, model, year, and color to the BoA Getaway Vehicle.  Thus, in both the February 14, 2022 and the June 9, 2022 robberies, within approximately 30 minutes prior to each robbery, an older model white Chevrolet Tahoe with tinted windows, consistent in make, model, color, and year with DAVIS's WCU Casing Vehicle is seen on video leading the suspect vehicles for each robbery (the WCU Getaway Vehicle and the BoA Getaway Vehicle).



WCU Casing Vehicle at WCU on 1/24/22



DAVIS's WCU Casing Vehicle on Ring Camera on 2/14/22

16



DAVIS's WCU Casing Vehicle on Ring Camera on 2/14/22




DAVIS's WCU Getaway Vehicle at 2/14 WCU Robbery



DAVIS's WCU Casing Vehicle & BoA Getaway Vehicle on Ring Camera on 6/9/22

17

 

DAVIS's WCU Casing Vehicle and the BoA Getaway Vehicle on Ring Camera on

6/9/22



BoA Getaway Vehicle at BoA Robbery on 6/9/22

37.  On June 24, 2022, investigators obtained a GPS tracker
warrant for the WCU Casing Vehicle in order to ascertain if
DAVIS was using the WCU Casing Vehicle in furtherance of
planning another robbery or casing additional banks.

18

38.   On June 30, 2022, the tracking device was installed on the WCU Casing Vehicle.  I have reviewed the tracking device records and learned the following:

a.   On July 1, 2022, at approximately 6:36 p.m., the WCU Casing Vehicle drove to SchoolsFirst Credit Union located at 3401 West Century Boulevard, Inglewood, California. (Sectran Security Service, Inc., services all SchoolsFirst Credit Unions in Los Angeles County).

b.   On July 18, 2022, at approximately 5:45 p.m., the WCU Casing Vehicle drove to California Credit Union located at 3550 West Century Boulevard, Inglewood, California.

39.   Based on surveillance efforts and departmental resources, as well as the GPS location of Davis Cell, DAVIS primarily resides in Palmdale.  His secondary residence is the Chesapeake Ave. Address.  Neither of his residences are near these bank locations.  Moreover, each of the credit unions have locations that are closer to his primary and secondary address.

40.   On July 20, 2022, investigators served a Federal Grand Jury Subpoena to Baxter Credit Union ("BCU") for DAVIS's subscriber information, financial statements and transactions. BCU returns showed that DAVIS frequently used the WCU ATM to withdraw money.  Financial transactions from BCU showed that DAVIS used the WCU ATM for either deposits or withdrawals approximately 12 times between January and February 2022.

41.   On May 19, 2022, investigators served a Federal Grand Jury Subpoena to WCU for DAVIS's subscriber information, financial statements, and transactions.  WCU responded to the

subpoena by informing law enforcement that DAVIS did not ever
hold an account with WCU.

42.  On September 9, 2022, investigators served a Federal
Grand Jury Subpoena to Zelle/Early Warning Services, LLC for
DAVIS's bank accounts.  Zelle/Early Warning Services, LLC
responded to the subpoena on October 10, 2022.  The returns
showed that DAVIS's bank accounts were held with BCU and Ally
Bank.  There was no evidence showing DAVIS held accounts at
either SchoolsFirst Credit Union or California Credit Union.

**G.**    **September 15, 2022 Robbery of Brinks Armored Vehicle
at PLS Check Cashing Store in Los Angeles, CA**

43.  On September 15, 2022, at approximately 12:20 p.m.,
law enforcement responded to a robbery call at PLS Check Cashing
Store ("PLS") at 2601 South La Brea Avenue, Los Angeles,
California.  The responding officers determined that the victim,
R.M. -- an armed employee of a Brinks armored vehicle -- was
robbed at gunpoint.  Law enforcement interviewed R.M. following
the robbery.  I have reviewed that report and learned the
following:

a.  Shortly after the armored vehicle arrived outside
of the PLS and parked, R.M. exited the armored vehicle carrying
a Brinks bag containing money for drop off at PLS.  While R.M.
stood outside of an employee entrance for PLS waiting for the
door to open, he observed a gray Ford Explorer SUV with black
trim and no license plates (the "PLS Getaway Vehicle"), parked
in the parking lot.

b.   R.M. then noticed a green laser pointed at him, felt a gun on his shoulder, and observed three subjects approach him.  The first subject ("SUBJECT 1") pointed a "sub machine gun" at him.  The subjects then demanded R.M.'s keys, and simultaneously gave him confusing and contradicting orders to stand up, get on the ground, and get on his knees.  The second subject ("SUBJECT 2") removed the victim's service pistol and keys from his belt.

c.   SUBJECT 1 held R.M. at gunpoint outside of the armored vehicle while SUBJECT 2 and the third subject ("SUBJECT 3") entered the armored vehicle.  SUBJECT 2 and SUBJECT 3 then exited the armored vehicle carrying bags containing money.  All three subjects entered the PLS Getaway Vehicle and drove away. R.M. described all three subjects as adult black males wearing dark clothing.  SUBJECT 1 was heavy set while SUBJECT 2 and SUBJECT 3 were average height and build.  One subject had longer hair with braids or dreads.

44.  I have reviewed surveillance video recordings of the robbery and I learned the following:

a.   The robbery as seen in the video matches the description of the robbery by R.M..

b.   At approximately 12:16 p.m. on September 15, 2022, a vehicle later identified as the PLS Getaway Vehicle with no license plates, entered the PLS parking lot and parked temporarily in a parking spot.  Approximately one minute later, the armored vehicle entered the parking and parked temporarily near PLS.  The PLS Getaway Vehicle repositioned in the parking

lot and parked directly behind the armored vehicle, facing in the opposite direction.  The armored vehicle drove forward and parked directly outside of the PLS.  R.M. exited the armored vehicle carrying a bag, closed the truck's side door, and approached the PLS employee door.

  c. While R.M. stood waiting outside of the PLS door, three subjects exited the PLS Getaway Vehicle and approached him.  SUBJECT 1 carried a black short-barreled assault rifle and pointed it at R.M.  R.M. dropped the money bag and ran away from the subjects toward the front of the armored vehicle.  After running a few feet, SUBJECT 1 caught up with R.M., who stopped running.  SUBJECT 1 held R.M. at gunpoint.  SUBJECT 2 carried what appeared to be white zip-ties in his right hand, removed R.M.'s service pistol out of his holster and the keys from R.M.'s belt.  SUBJECT 3 carried what appeared to be a large dark open duffel bag.

  d. SUBJECT 1 appeared to direct R.M. to walk back to the side door of the armored vehicle with his hands up and the rifle pointed at his back.  SUBJECT 2 approached the side door of the truck, unlocked it with R.M.'s key, and opened the door. SUBJECT 2 and SUBJECT 3 entered the truck, while SUBJECT 1 remained outside of the truck, still pointing the rifle at R.M.'s back.  SUBJECT 1 appeared to direct R.M. to kneel on the ground with his hands still in the air.

  e. SUBJECT 2 exited the truck carrying a Brinks bag containing cash and picked up the Brinks bag that R.M. previously dropped on the ground.  SUBJECT 3 followed and exited

the truck carrying the black duffel bag and cash.  All three subjects departed the PLS in the PLS Getaway Vehicle.

f.   SUBJECT 1 appeared to be an adult dark-skinned male, wearing a dark facing covering, a black hooded sweatshirt with the hood up, black pants, black and white Nike shoes, and black gloves.  SUBJECT 1 carried a black assault-style rifle with an optic.

g.   SUBJECT 2 appeared to be an adult male, wearing a dark ski mask that covered almost all of his face and head, a black hooded sweatshirt with the hood down, black pants, black and white shoes, and blue gloves.  SUBJECT 2 appeared to carry white zip ties in his right hand.  SUBJECT 2's build and appearance is consistent with HOBSON, corroborated by the DVR footage at the Chesapeake Ave. Address described below.

h.   SUBJECT 3 appeared to be an adult dark-skinned male, wearing a dark face covering, a red or maroon hooded sweatshirt with the hood up, dark gray pants, white shoes and dark gloves.  SUBJECT 3 appeared to carry a large black duffel bag.

45.  Brinks Corporate Security confirmed the loss amount from the robbery to be approximately $374,168.

46.  On September 15, 2022, approximately two hours after the robbery at PLS, law enforcement conducted surveillance at the Chesapeake Ave. Address, which is approximately .6 miles away from PLS.  Law enforcement observed DAVIS taking out the trash at the Chesapeake Ave. Address, then going into the Chesapeake Ave. Address.  DAVIS started driving away from the

Chesapeake Ave. Address, but stopped to speak with a neighbor before departing the area.

47.   Based on surveillance efforts conducted by law enforcement from August 2022 to October 2022, it appears that DAVIS is the primary operator of the WCU Casing Vehicle, as DAVIS is the only person observed driving the WCU Casing Vehicle.

**H.   Los Angeles Sheriff's Department Traffic Stop of HOBSON**

48.   On September 30, 2022, LASD Carson patrol units conducted a traffic stop of HOBSON while he was driving for a traffic violation.  In their conversation with HOBSON, LASD asked about HOBSON's tattoos.  HOBSON exited the vehicle and took off his shirt to show the officers his back tattoos. HOBSON had tattoos all over his back and specifically, on HOBSON's right hip, officers noticed a tattoo in the shape of a star.

49.   I reviewed the footage from LASD's traffic stop with HOBSON and recognized the star tattoo as the same star tattoo that was observed in the surveillance footage from the WCU robbery on February 14, 2022.  HOBSON's star tattoo appears to be in the same location, just above the right hip, as the star tattoo shown on SUBJECT 3's lower back in the February 14, 2022 WCU Robbery.  An LAPD RHD detective also reviewed the photo and observed the tattoo during HOBSON's booking on a separate charge

and confirmed it to be the same as in the surveillance photo and traffic stop.



WCU Surveillance Image



Hobson tattoo on 9/30/22

I.  **Search Warrants Executed at the Chesapeake Ave. Address, and Other Listed Addresses on October 18, 2022**

50.  On October 17, 2022, the Honorable Pedro V. Castillo, United States Magistrate Judge for the Central District of California, issued residential search warrants for the Chesapeake Ave. Address and two other listed residences for HOBSON and DAVIS.

51.  On October 18, 2022, the FBI, in partnership with LAPD, HPD, and Inglewood Police Department, executed the search warrants and collected evidence at each location.  At the Chesapeake Ave. Address, the FBI seized a home security camera DVR system. DAVIS's father, James Russell Davis Sr., provided the FBI with the password to the DVR system.

52.   Between December 30, 2022 and January 18, 2023, I reviewed the footage extracted from the DVR system and observed the following:

53.   The DVR system consisted of several cameras.  Each of the cameras contained recordings that appeared to be motion activated recordings.  The time shown on the recordings was accurate but appears to be so based on the times of daylight or darkness. The DVR system's footage did not go back past March of 2022.

54.   On June 8, 2022, the night before the BoA robbery, at approximately 11:01 p.m., the footage showed a silver Chevrolet Equinox, consistent in make, model, color, year, and appearance consistent with the BoA Getaway Vehicle, slowing down in front of the Chesapeake Ave. Address.  Minutes later, at approximately 11:05 p.m., the footage shows DAVIS walking away from the residence and meeting up with two unidentified males, one wearing what appears to be a security guard uniform.  The other unidentified male appeared to be wearing Nike Jordan shoes, resembling those worn by SUBJECT 2 in the June 9 BoA robbery. Also seen in the footage at this time is the silver Chevrolet Equinox consistent with the BoA Getaway Vehicle, parked outside of the residence in front of what appeared to be the WCU Casing Vehicle.  At approximately 11:59 p.m., the footage showed what appeared to be the WCU Casing Vehicle driving away from the residence, followed by the same silver Chevrolet Equinox consistent in make, model, year, and color with the BoA Getaway Vehicle.





BoA GETAWAY VEHICLE

June 8, 2943 Chesapeake Video





Subject 2 Shoes in Sept 15 Robbery



Subject 2 in Sept 15 Robbery

Shoes in June 8 Chesapeake Video



Tahoe and Equinox in Chesapeake Video

55. On September 15, 2022 at 11:56 a.m. (approximately 25 minutes before the PLS robbery), the video footage showed DAVIS arrive at the residence and park the WCU Casing Vehicle in the driveway.  The next video started with DAVIS at the rear of the WCU Casing Vehicle gathering items from the car.  The video abruptly stopped and jumped to 12:00 p.m.  At this time, HOBSON was also near the driveway of the residence and appeared to be talking to DAVIS.  HOBSON was wearing black sweatpants and the same shoes worn by SUBJECT 2 during the robbery.  DAVIS continued to gather items from the vehicle and brought them to the backyard.  HOBSON walked to a white Honda Accord that was parked nearby.  The white Honda Accord was consistent with the make, model, year, color, and appearance as the WCU Getaway Vehicle.  HOBSON entered the driver seat of the vehicle and the video abruptly stopped.  The next video at 12:05 p.m. -- 15 minutes before the PLS robbery -- showed a gray Ford Explorer, consistent in make, model, year, and color as the PLS Getaway

Vehicle, stopped in the middle of the street between the white Chevy Tahoe consistent with the WCU Casing Vehicle and white Honda Accord consistent with the WCU Getaway Vehicle.  The three vehicles then travel in tandem northbound on Chesapeake.  The location of the robbery was .7 miles from the Chesapeake Ave. Address.



Chesapeake Video (Hobson and Davis)



PLS Robbery Video (SUBJECT 2)



HOBSON Shoes at Chesapeake Ave Address



SUBJECT 2 shoes at PLS Robbery

56.   At approximately 2:45 p.m. -- a few hours after the BoA robbery -- video showed DAVIS and the WCU Casing Vehicle back at the residence.  DAVIS was wearing different shoes than those he left wearing and was carrying a white plastic grocery bag.  He first placed that bag under a table in his backyard, then later carefully placed it in a trash can.

57.   On September 14, 2022 at 12:59 p.m. -- the day before the BoA robbery -- the Chesapeake Ave. Address video showed DAVIS at the WCU Casing Vehicle while it was parked in the driveway.  At 10:56 p.m., video showed the gray Ford Explorer, consistent in make, model, color, and year of the PLS Getaway Vehicle  arrive at the residence, make a three-point turn and park nearby.  The next video started at 11:20 p.m.

58.   In addition to the home security camera DVR system seized at the Chesapeake Ave. Address, the FBI also seized HOBSON's iPhone at his residence, 816 Bartlett Street, Unit 213, Los Angeles, California.  Upon reviewing HOBSON's iPhone, I reviewed a text message conversation between HOBSON and a recipient named "Lil Calvin Rely."  According to the timestamp at the top of the text message, the conversation started at 3:48 p.m. on Tuesday February 15, one day after the February 14 WCU robbery, in which J.G.'s service pistol was stolen and accidentally fired.  "Lil Calvin Rely" asked, "How much do you want for da other one?", to which HOBSON replied, "800 bro." "Lil Calvin Rely" then asked, "Is it all the way bad or just hot," to which HOBSON replied, "Bro it's not all the way bad it

was just shot doing a get down no body's I just ain't fucking with it bro lol."

59.    Based on my training and experience I know that criminals who use firearms in committing a crime will often attempt to dispose of said firearms after the crime has been committed in order to rid themselves of the evidence.  I believe HOBSON was trying to sell the firearm used in the February 14 WCU robbery as the firearm was accidentally discharged during the robbery and HOBSON is talking about selling something because "it was just shot doing a get down."

**J.    January 9, 2023 Robbery of 99 Cents Only store ("99C") in Los Angeles, California**

60.    On January 9, 2023, at approximately 7:15 a.m., LAPD officers responded to a reported robbery at 3060 South Crenshaw Boulevard.  They met with victim F.V. who was working as a Brinks armored car driver.  F.V. said that every Monday he takes the same route.  F.V. arrived at 99C at approximately 7:11 a.m. for a money pick up.  As F.V. exited 99C, he noticed a black sedan parked next to his Brinks vehicle and saw two men approach him. Suspect 1 was holding an AR style rifle and ordered F.V. to the ground.  F.V. complied and laid face down on the ground and Suspect 1 removed F.V.'s handgun from his holster.  Suspect 2 took F.V.'s key (to the Brinks truck) and his money bag.  Suspect 2 used F.V.'s key to enter the Brinks truck.  Suspect 2 later exited the Brinks truck with bags of currency.  Both suspects fled in the black sedan vehicle with the property.

61.   Suspects were described as:

a.   Suspect 1, Male, 6'00", 210 lbs, with AR style rifle, consistent with HOBSON's build and characteristics.

b.   Suspect 2, Male, 5'07", slim build.

62.   Detectives obtained video from the Brinks truck, Union Bank (adjacent to 99C) and the Arco Gas Station (across the street).  Below are images from the above listed video. Upon further review of the video, it appeared there was a third suspect, who remained inside of the vehicle. The suspect vehicle appeared to be a black Kia K5 (the "99C Getaway Vehicle").

 

09/15/22 PLS Robbery                    01/09/23 99C Robbery

63.   After the 99C robbery on January 9, 2023, I further reviewed the footage from the home security DVR system.  I

noticed that on September 14, 2022 at 12:59 p.m., the footage showed DAVIS at his WCU Casing Vehicle while it was parked in the driveway and a black Kia K5, consistent in make, model, year and color as the 99C Getaway Vehicle, parking behind the WCU Casing Vehicle in the driveway.  Later in the evening at 10:23 p.m., a black Kia K5, consistent in make, model, year, and color as the 99C Getaway Vehicle arrived back at the residence and parked across the street.  A large male, consistent with DAVIS's build and description, exited the driver seat of the 99C Getaway Vehicle.  DAVIS's WCU Casing Vehicle was also parked at the residence at this time.  At 10:56 p.m., footage showed a gray Ford Explorer, consistent in make, model, year, and color as the PLS Getaway Vehicle, arrive at the residence, make a three-point turn and park nearby.  Then, at approximately 11:20 p.m., DAVIS's WCU Casing Vehicle was no longer at the residence and 99C Getaway Vehicle and the PLS Getaway Vehicle follow each other southbound on Chesapeake.




Chesapeake Video (9/14/2022)     99C Robbery Suspect Vehicle (1/9/23)

### K.    Similar Modus Operandi in All Four Robberies

64.    Each robbery was committed by three suspects who brandished what appeared to be a black short-barreled assault rifle, pointing them directly at the victims.  All four robberies were of armored vehicle drivers as they were handling cash.  All four armored vehicles only had one employee driving and operating the armored vehicles.  All four robberies consisted of one of the robbers stealing the armored vehicle driver's service pistol from their holster.  In all four robberies, the robbers attempted to gain access to the armored vehicle.  In three of the four robberies, the robbers entered the armored vehicle and obtain cash from inside.  The modus operandi of the robbers was described in the police reports and witness statements ordering the armored vehicle driver to the ground, and grabbing the victim's service pistol and keys, while brandishing a firearm.  In all four robberies, one of the robbers brought white zip ties with them either in their hand or in their pocket.  Several of the witness descriptions and surveillance images of the robbers in all three robberies depict three males who had almost their entire faces covered, gloves on their hands, wearing hooded sweatshirts with their hoods on in every robbery.  The robberies were each within two miles of the previous.  In two of the robberies, the suspects appeared to bring the same bag.  In all four robberies, one of the suspects was armed with a rifle that has a sling attached.

65.    Based on the suspicious activity on January 24, 2022 and subsequent robbery on February 14, 2022 -- which included

the same location, same truck, and same driver at the exact same time of morning -- I believe that DAVIS and HOBSON were involved in the February 14, 2022 robbery.  That belief is bolstered by defendant's criminal histories (which include multiple burglary related crimes) and appearance which are consistent with that seen on the February 14, 2022 video -- including a distinctive tattoo.  That the June 9, 2022 robbery was only .6 miles away and both the June 9, 2022 robbery and September 15, 2022 robbery were conducted in almost the exact same manner draws me to believe that they were conducted by the same crew.  That all of the differing getaway vehicles were seen at HOBSON and DAVIS's Chesapeake Ave. Address, often with individuals matching the description and/or wearing the same footwear as the robbers, leads me to believe that the same crew is responsible for all robberies.

**L.   HOBSON's Criminal History**

66.   Based on my review of HOBSON's criminal history, I learned the following:

67.   HOBSON, the passenger with DAVIS on the day of the suspicious activity, also has the following convictions:

a.   First Degree Robbery in violation of California Penal Code § 211, March 7, 2003; and

b.   Assault with Dangerous Weapon in violation of California Penal Code § 245(A)(1), March 7, 2003.

### M.   DAVIS's Criminal History

68.   Based on my review of DAVIS's criminal history, I learned the following:

a.   On August 25, 2010, DAVIS was convicted of Possession of Burglary Tools, in violation of California Penal Code § 466;

b.   On August 9, 2017, DAVIS was convicted of receipt of stolen property in violation of California Penal Code § 496(a);

c.   LAPD records also show that on January 26, 2015, DAVIS, along with four other suspects, were arrested for ATM theft in which the suspects fled with an entire ATM; and

d.   DAVIS is on formal probation for his convictions until January 7, 2025.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES

69.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary

directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

70.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

## VI. PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

71.   With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding computers and other electronic

storage devices, including electronic storage media, that may contain data subject to seizure pursuant to this warrant:

### A.    Forensic Imaging

72.    After securing the premises, or if sufficient information is available pre-search to make the decision, the executing agents will determine the feasibility of obtaining forensic images of electronic storage devices while onsite.  A forensic image is an exact physical copy of the hard drive or other media.  A forensic image captures all the data on the hard drive or other media without the data being viewed and without changing the data.  Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of the data for information subject to seizure pursuant to this warrant.  The feasibility decision will be based upon the number of devices, the nature of the devices, the volume of data to be imaged, the need for and availability of computer forensics specialists, the availability of the imaging tools required to suit the number and nature of devices found, and the security of the search team.  The preference is to image onsite if it can be done in a reasonable amount of time and without jeopardizing the integrity of the data and the agents' safety.  The number and type of computers and other devices and the number, type, and size of hard drives are of critical importance.  It can take several hours to image a single hard drive - the bigger the drive, the longer it takes.  As additional devices and hard drives are added, the length of time that the agents must remain onsite can become dangerous and impractical.

73.  If it is not feasible to image the data on-site, computers and other electronic storage devices, including any necessary peripheral devices, will be transported offsite for imaging.  After verified images have been obtained, the owner of the devices will be notified and the original devices returned within forty-five (45) days of seizure absent further application to this court.

**B.  Identification and Extraction of Relevant Data**

74.  After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant.  Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment and software. There are thousands of different hardware items and software programs, and different versions of the same programs, that can be commercially purchased, installed, and custom-configured on a user's computer system.  Computers are easily customized by their users.  Even apparently identical computers in an office or home environment can be different with respect to configuration, including permissions and access rights, passwords, data storage, and security.  It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

75.  Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging.  Searching by keywords, for example, often yields many thousands of hits, each of which must

41

be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant hit does not end the review process for several reasons. The computer may have stored metadata and other information about a relevant electronic record – e.g., who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted.  Keyword searches may also fail to discover relevant electronic records, depending on how the records were created, stored, or used.  For example, keywords search text, but many common electronic mail, database, and spreadsheet applications do not store data as searchable text. Instead, the data is saved in a proprietary non-text format. Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image. Graphic images, unlike text, are not subject to keyword searches. Similarly, faxes sent to the computer are stored as graphic images and not as text.  In addition, a particular relevant piece of data does not exist in a vacuum.  To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data.  Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in

the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

76.   It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users that generally is not visible to users.  Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time.  In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user.  For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

77.   Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling.  For example, a single megabyte of storage space is roughly equivalent of 500

double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced pages of text.  Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data.  And, this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer).  The sheer volume of data also has extended the time that it takes to analyze data.  Running keyword searches takes longer and results in more hits that must be individually examined for relevance.   And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

78.  Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including hashing tools to identify data subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files.  The identification and extraction process, accordingly, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred twenty (120) days of this warrant, absent further application to this court.

79.  All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

**C.   Genuine Risks of Destruction**

80.   Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, only if the subject receives advance warning of the execution of this warrant, will there be a genuine risk of destruction of evidence.

**D.  Prior Attempts to Obtain Data**

81.   The United States has attempted to obtain this data by other means.  For example, search warrants were obtained for the suspect social media accounts, but for many, it appears that communications had been deleted from the account, and/or the accounts themselves had been deleted.  In some instances, legal process was served for several accounts but the providers lacked sufficient information to provide responsive records.

V. <u>CONCLUSION</u>

82.   For all the reasons described above, there is probable cause to believe that HOBSON and DAVIS violated 18 U.S.C. § 1951(a) (Conspiracy to Commit Interference with Commerce by Robbery).

83.   Additionally, there is a fair probability that fruits,

//

//

//

//

//

evidence, or instrumentalities of the Subject Offenses will be found on the persons of HOBSON and DAVIS.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 17th day of
February , 2023.

KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE